DISTRICT OF NEW JERSEY
UNITED STATES BANKRUPTCY COURT
_____

**Caption in Compliance with D.N.J. LBR 9004-1**

BAKER BOTTS L.L.P.
Richard B. Harper
District Ct. New Jersey No. RH5979
New Jersey State Bar No. 85839
30 Rockefeller Plaza
New York, New York  10112
Telephone:  212.408.2675
Facsimile:  212.259.2475
Richard.harper@bakerbotts.com

Danny David (*Pro Hac*)
Texas State Bar No. 24028267
Kevin T. Jacobs (*Pro Hac*)
Texas State Bar No. 24012893
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522
danny.david@bakerbotts.com
kevin.jacobs@bakerbotts.com

Omar J. Alaniz (*Pro Hac*)
State Bar No. 24040402
2001 Ross Avenue
Dallas, Texas 75201
Telephone:  214.953.6500
Facsimile:  214.953.6503
omar.alaniz@bakerbotts.com

Attorneys for Creditor Sunnova Energy
Corporation

| | | |
|---|---|---|
| In Re: | § | Chapter 7 |
| | § | |
| CHARLES KARTSAKLIS, | § | Case No.:  18-29098-ABA |
| | § | |
| Debtor. | § | Judge:  Hon. Andrew B. Altenburg |

| | | |
|---|---|---|
| SUNNOVA ENERGY CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. _____ |
| | § | |
| CHARLES KARTSAKLIS, | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT (I) TO DETERMINE EXCEPTION FROM DISCHARGE
FOR MONEY OBTAINED BY FRAUD UNDER 11 U.S.C § 523(a)(2)(A) AND
(II) FOR DENIAL OF DISCHARGE UNDER § 727(a)(2)(A)**

Plaintiff Sunnova Energy Corporation ("Sunnova"), by undersigned counsel, hereby files this Complaint and states as follows:

**Preliminary Statement**

1.     Charles Kartsaklis ("Kartsaklis") devised the perfect scheme to get rich quick, using Sunnova Energy Corporation ("Sunnova") as an unknowing benefactor to fund Kartsaklis's lavish (yet fraudulent) lifestyle.

2.     At first, Kartsaklis and Sunnova had an amicable business relationship in the residential solar industry, though time would reveal such relationship was premised on Kartsaklis's fraud.  Sunnova and Code Green Solar, LLC ("Code Green"), of which Kartsaklis was the founder and CEO, entered into a contract under which Code Green assisted Sunnova with the sale, marketing, installation, and maintenance of solar systems ("System" or "Systems") on the rooftops of Sunnova's customers.

3.     As is common in the industry, Sunnova paid Code Green with large lump-sum payments per System, which were typically paid at the beginning of the project (when very little actual work had been done).  Code Green received approximately two-thirds of the total value of its contract with Sunnova before any actual installation work had taken place.  Moreover, later in

2

the relationship, when Code Green began experiencing cash flow concerns, after receiving assurances and a personal guarantee from Kartsaklis, Sunnova made additional weekly payments of hundreds of thousands of dollars to try to keep Code Green solvent.  As part of this arrangement, Kartsaklis made false representations to obtain money from Sunnova.  Kartsaklis assured Sunnova that any advances would only be used for operational expenses incurred in connection with Sunnova projects and Kartsaklis guaranteed that Code Green would complete a certain number of Systems per week in return for the advances, signing a personal guarantee to that effect.

4.      Unbeknownst to Sunnova, such representations were false and the negative balance owed to Sunnova continued to grow while Code Green failed to meet its promised completion schedule.

5.      Because Kartsaklis's and Code Green's broken promises and money owed to Sunnova swelled to overwhelming levels, Sunnova sought arbitration against Code Green and Kartsaklis, individually as guarantor, for the negative balance due to Sunnova under the contracts among them.  On July 24, 2018, the Arbitrator found in Sunnova's favor and issued an award against Code Green and Kartsaklis, individually as guarantor, awarding Sunnova $14,471,016 in damages and an additional $1,425,589.36 in legal fees, costs, and interest, for a total award of $15,896,605.36.

6.      Because Kartsaklis is personally liable for the arbitration award in Sunnova's favor, Kartsaklis's personal bankruptcy petition, filed on September 26, 2018, seeks to discharge the $15,896,605.36 arbitration debt owed to Sunnova, a listed creditor in the petition.

7.      However, Kartsaklis's fraudulent representations to Sunnova necessitates that such debt not be discharged.

3

8.      In this Complaint, Sunnova requests the following relief: (i) that all of Kartsaklis's liabilities to Sunnova be determined nondischargeable under 11 U.S.C. § 523(a)(2)(A) on account of Kartsaklis's false pretenses, false representations, and actual fraud; and (ii) that Kartsaklis be denied a discharge under § 727(a)(2)(A) due to Kartsaklis's fraudulent transfers of assets within a year of his bankruptcy petition.

## Jurisdiction and Venue

9.      Kartsaklis filed his petition for relief under chapter 7 of the Bankruptcy Code on September 26, 2018.

10.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334.

11.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), (J).

12.     Venue is proper in this Court under 28 U.S.C. § 1409(a).

## The Parties

13.     Sunnova is headquartered in Houston, with its principal offices located at 20 Greenway Plaza, Suite 475, Houston, Texas 77046.  Sunnova is incorporated under the laws of Delaware.

14.     Kartsaklis is an individual and a New Jersey resident, residing at 1 Crisfield Road, Sicklerville, NJ 08081.

## Factual Allegations

15.     The allegations contained in the paragraphs above are incorporated herein by reference.

4

**A.** **Sunnova enters into a business relationship with Code Green, which ends when Code Green breaches its contract with Sunnova.**

16.     Sunnova works with regional partners ("Channel Partners") across the United States, including in New Jersey.  These Channel Partners assist with the sale, marketing, installation, and maintenance of Systems on the rooftops of Sunnova's customers.

17.     Code Green was one of Sunnova's Channel Partners in New Jersey.  Under their contract, called a Channel Partner Agreement ("CPA"), Code Green was responsible for delivering installed solar systems on Sunnova's customers' homes.

18.     Sunnova paid Code Green with several lump-sum payments per system.  While the exact percentages varied over time, Sunnova typically paid Code Green approximately 65% of the total contract amount at the beginning of the job (when very little actual work had been done).

19.     Sunnova would then pay Code Green additional amounts while the work was proceeding and a final small payment when work was completed, which typically amounted to no more than 10% of the total contract value.

20.     Under this payment system, Code Green received approximately two-thirds of the total value of the contract before any actual installation work had taken place.

21.     From time to time, customers would cancel their solar system installation after Code Green had already received its initial 65% payment, and thus, for each such system, Code Green was holding thousands of dollars that the CPA required it to return to Sunnova.

22.     This payment system led to further abuses.  For example, at the direction of Kartsaklis, Code Green would initiate a large number of projects—far more than it could reasonably complete with its personnel—to run up the amount of the initial payments it would receive.  When those systems were later cancelled because Code Green did not have the

5

resources to timely install them, Code Green and Kartsaklis were left with hundreds of thousands of dollars of advance payments owed to Sunnova, but of course, those advances were never actually paid back.

23.     Moreover, in some instances, after Code Green accepted the initial payment for a system from Sunnova, it would encourage the customer to cancel the contract, only to then "flip" the project to another solar provider that Kartsaklis had enlisted.  Thus, Code Green and Kartsaklis would be paid twice for one System—once by Sunnova and once by the Sunnova competitor to which it would flip the System.

24.     Despite the fact that Code Green was initiating projects, thus entitling it to payments from Sunnova, payments specifically designed to help with cash flow, Code Green nevertheless had financial difficulties.

25.     To address these cash flow concerns, Kartsaklis requested that Sunnova make weekly payments of hundreds of thousands of dollars in exchange for a guarantee, made by him and Code Green, that Code Green would complete between 30 and 45 Systems per week through July 2018.  Facing no other commercial means to recover its investment in Code Green projects, Sunnova agreed to this arrangement.

26.     Code Green and Kartsaklis agreed that these payments would be used only for "operational expenses incurred in connection with Sunnova projects."

27.     Even those millions of dollars in advances could not save Code Green from itself and from Kartsaklis, and in the face of Code Green's refusal to perform under the CPA and its ever-increasing negative balance to Sunnova, Sunnova was left with no option but to terminate the CPA and seek arbitration.

6

28.     The arbitration took place on May 1-4 and May 11 in Houston, Texas, before Arbitrator Elizabeth Ray.

29.     On July 24, 2018, the Arbitrator found in Sunnova's favor and issued an award against Code Green and Kartsaklis, individually as guarantor, awarding Sunnova $14,471,016 in damages and an additional $1,425,589.36 in legal fees, costs, and interest, for a total award of $15,896,605.36.

30.     That award remains unpaid.

**B.     Kartsaklis steals Sunnova's money.**

31.     Long before Code Green failed—Code Green's website has been taken down and a recent news article quoted Kartsaklis as saying the company was closing—Kartsaklis had already hatched a scheme to make off with Sunnova's payments to Code Green.

32.     Kartsaklis agreed that he would be personally liable for Code Green's debts to Sunnova. This personal guarantee was given to Sunnova to induce Sunnova to continue funding Code Green. And it worked. Sunnova sent Code Greens millions of additional dollars in exchange for this guarantee and this money found its way directly into Kartsaklis's pockets.

33.     Kartsaklis, of course, never intended to honor the personal guarantee. His intention was to keep the money flowing into his own pockets for a long as he could.

34.     In fact, Kartsaklis contested the applicability of the personal guarantee at the arbitration—despite the fact that millions of dollars flowed to him and his company as a result of him giving the personal guarantee.

35.     As became clear during the arbitration, Kartsaklis's plan to avoid liability to Sunnova and to divert Sunnova's funds for his personal gain was put into place far before the personal guarantee was given.

36.     In truth, part of the reason that Code Green failed is that Kartsaklis was looting it from the beginning.

37.     Kartsaklis used Sunnova's money to throw lavish parties in Las Vegas under the guise of attracting new customers and contractors.

38.     He used Sunnova's money to fly Code Green's principals in private planes and rent a luxury suite at a Dallas Cowboys' game in Arlington, Texas.  He used Sunnova's money for Code Green principals to attend the last several Superbowls and to purchase a luxury suite at the Philadelphia Eagles' stadium.

39.     Kartsaklis even used Sunnova's money to host a "charity" event at Sunset Key, an island in the Florida Keys.  He rented a fleet of Ferraris and Bentleys for that weekend and took his son along—and even took the time to take a video of his son on the hood of one of the Bentleys "donated" for the event by Code Green.   The video can be found here: https://www.facebook.com/MartinoCartier/videos/10212289799896027/.

40.     In reality, all of this—the luxury suite, the private plane, the Ferraris and Bentleys—were paid for by Kartsaklis's theft from Sunnova.

**C.     As Code Green fails, Kartsaklis hides Sunnova's money.**

41.     Even before Kartsaklis's fraudulent conduct came to light, Kartsaklis understood that Sunnova would eventually discover his theft and misdeeds.

42.     To prevent Sunnova from recouping what it had lost, Kartsaklis began transferring assets.

43.     For example, instead of using Sunnova's money to fund ongoing operations, Kartsaklis bought Berkshire Hathaway A stock—valued at more than $320,000 per share—in his son's name, thus embroiling his child in this fraudulent scheme.

44.     Further, Kartsaklis, along with Code Green's former chief operating officer Jonathan Seibert ("Seibert"), who was Kartsaklis's right-hand man, transferred Code Green assets to a "new" company, Vision Solar NJ LLC ("Vision Solar").  According to Vision Solar's website, it does exactly what Code Green did—installs solar systems that are financed by other companies, such as Sunnova.

45.     Vision Solar has more in common with Code Green than that, however.  Vision Solar is operating at the same address and with the same telephone number that was formerly used by Code Green.  Vision Solar's website even has some of the same customer testimonials that appeared on Code Green's former website.

46.     Stated differently, Vision Solar is the new Code Green, unencumbered by the $15 million arbitration award.  Sunnova is, of course, separately pursuing an action against Code Green, Vision Solar, and Seibert for conversion and fraudulent transfer.

47.     In addition to using what was left of Sunnova's money to start a new company, Kartsaklis also used Sunnova's assets to start the new company.  Physical inventory paid for by Sunnova, customer lists, leads, blueprints, works-in-progress, and other materials—all funded by Sunnova—were fraudulently transferred by Kartsaklis to fund Vision Solar's start.

### Claim for Relief

### *Count I: Determination of Dischargeability — 11 U.S.C. § 523(a)(2)(A)*

48.     The allegations contained in the paragraphs above are incorporated by reference.

49.     Section 523(a)(2)(A) provides that an individual debtor is not discharged from any debt for money, property, or services, obtained by false pretenses, a false representation, or actual fraud.

50.     Kartsaklis owes Sunnova more than $15 million, a debt which he seeks to discharge through this Bankruptcy proceeding.  But Kartsaklis's debts to Sunnova should not be

discharged because the amounts he owes Sunnova were obtained through false representations and outright fraud.

51.    Kartsaklis persuaded Sunnova to send Code Green millions of dollars under the blatantly false representation that such money would only be used to fund "operational expenses incurred in connection with Sunnova projects."

52.    Kartsaklis's false promises were not limited to just words—he signed a personal guarantee assuming legal responsibility for this debt knowing it would never be repaid.

53.    In fact, despite the clear language of the guarantee, Kartsaklis fought this repayment responsibility at the arbitration hearing.

54.    At all relevant times Kartsaklis knew that the representations and pretenses were false; that he would siphon away Sunnova's funds and use them for lavish parties and to form a new company unencumbered with debt.

55.    Kartsaklis knowingly and intentionally made the false representations, maintained the false pretenses, and signed the personal guarantee described above with the intent to deceive Sunnova about the longevity of its commercial relationship with Code Green and induce Sunnova into funding his frivolous endeavors unrelated to the solar panel industry.

56.    Code Green had the appearance of operating as a legitimate solar panel installer, and Sunnova justifiably relied on the false representations, false pretenses and actual fraud of Kartsaklis, Code Green's founder and CEO, as described above, when it advanced substantial sums of money.

57.    The impetus behind these substantial payments was Kartsaklis.  The personal guarantee he signed ensured Sunnova's payments would continue, and his lies and deceit caused the deterioration of Code Green's relationship with Sunnova.

58.     As a proximate result of that justifiable reliance, Sunnova suffered material and substantial injuries and Sunnova therefore respectfully requests that the Court declare that its arbitration award against Kartsaklis, individually as guarantor, in the amount of $14,471,016 in damages and an additional $1,425,589.36 in legal fees, costs, and interest, for a total award of $15,896,605.36, is not dischargeable under section 523(a)(2)(A).

*Count II: Denial of Discharge — 11 U.S.C. § 727(a)(2)(A)*

59.     The allegations contained in the paragraphs above are incorporated by reference.

60.     Section 727(a)(2)(A) provides that a discharge shall not be had if "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—property of the debtor, within one year before the date of filing of the petition."

61.     Within a year of Kartsaklis's bankruptcy petition, filed on September 26, 2018, Kartsaklis transferred property that he obtained from Sunnova to his son and to Vision Solar in order to defraud Sunnova.

62.     Such transfers were fraudulent and made with the intent to defraud Sunnova.

63.     In fact, Vision Solar was formed specifically to avoid creditors—there was no other reason to form an identical solar panel installation company at the same time that Code Green was collapsing. Kartsaklis wanted a "clean" slate, one that was ironically formed by dirty business practices with fraudulently-transferred funds.

64.     Sunnova therefore respectfully requests that the Court deny a discharge to Kartsaklis, including Sunnova's arbitration award against Kartsaklis, individually as guarantor, in the amount of $14,471,016 in damages and an additional $1,425,589.36 in legal fees, costs, and interest, for a total award of $15,896,605.36.

## <u>Conclusion</u>

WHEREFORE, Sunnova respectfully requests that the Court enter judgment in its favor

and grant any other relief as the Court may deem just and proper.

Dated: January 4, 2019                    Respectfully submitted,


BAKER BOTTS L.L.P.


By:     */s/ Richard B. Harper*
        Richard B. Harper
        District Ct. New Jersey No. RH5979
        New Jersey State Bar No. 85839
        30 Rockefeller Plaza
        New York, New York  10112
        Telephone:  212.408.2675
        Facsimile:  212.259.2475
        richard.harper@bakerbotts.com

        Danny David (*Pro Hac*)
        State Bar No. 24028267
        Kevin T. Jacobs (*Pro Hac*)
        State Bar No. 24012893
        One Shell Plaza
        910 Louisiana Street
        Houston, Texas 77002
        Telephone: 713. 229.1234
        Facsimile: 713.229.1522
        danny.david@bakerbotts.com
        kevin.jacobs@bakerbotts.com

        Omar J. Alaniz (*Pro Hac*)
        State Bar No. 24040402
        2001 Ross Avenue
        Dallas, Texas 75201
        Telephone:  214.953.6500
        Facsimile:  214.953.6503
        omar.alaniz@bakerbotts.com

        COUNSEL FOR SUNNOVA ENERGY CORPORATION

12